**UNITED STATES of America,
Plaintiff,**

v.

**Lawrence X. CUSACK Jr., a/k/a "Lawrence X. Cusack III," a/k/a "Lex Cusack," Defendant.**

No. 98 CR. 691(DLC).

United States District Court,
S.D. New York.

Sept. 17, 1999.

Paul A. Engelmayer, Peter G. Neiman, Assistant United States Attorneys, United States Attorney, Southern District of New York, New York City, for plaintiff.

Maranda E. Fritz, Fritz & Miller, P.C., New York City, Robert F. Katzberg, Kaplan & Katzberg, New York City, for defendant.

### OPINION AND ORDER

COTE, District Judge.

After a jury trial, defendant Lawrence X. Cusack ("Cusack") was convicted on April 30, 1999, of thirteen counts of wire and mail fraud in violation of 18 U.S.C. §§ 1341, 1343 for his role in a fraudulent scheme involving the sale of a number of documents that he claimed contained the handwriting of President John F. Kennedy and other prominent figures. On May 26, 1999, the Government gave notice of several sentencing adjustments and departures. Subsequently, on June 28, 1999, the Court also gave notice of several possible adjustments and departures and set a schedule for the briefing of those issues by the parties. In particular, the Court required the parties to address a possible adjustment for abuse of trust, a possible criminal history category departure based on the defendant's conduct, and the appropriateness of any adjustment or departure based on the defendant's wearing of a military uniform. At a conference with the parties on July 12, 1999, the Court indicated that the conduct cited as a basis for a criminal history departure would also be considered as a basis for a departure under Section 5K2.0 of the Sentencing Guidelines.

On August 24, 1999, the Probation Department issued a Presentence Investigation Report (the "PSR"). The PSR calculated an adjusted offense level of twenty-eight as follows: a base offense level of six, an increase of fourteen levels based on a total loss of $7 million, an increase of two levels for more than minimal planning under Section 2F1.1(b)(2), an adjustment of four levels for Cusack's role in the offense under Section 3B1.1(a), and an adjustment of two levels for obstruction of justice based on the provision of handwriting exemplars under Section 3C1.1.

By letter dated September 3, 1999, counsel for defendant indicated that it was only objecting to the obstruction of justice adjustment. By a series of letters, counsel for defendant has also objected to the adjustments and departures not included in the PSR that have been noticed by the Government and the Court. Finally, on September 13, 1999, the defendant moved for a downward departure based on the defendant's diminished mental capacity.

## BACKGROUND ·

The evidence at trial overwhelmingly established the following. In 1993, Cusack was working as a paralegal at the law firm founded by his father, Cusack & Stiles, and was earning between $25,000 and $35,000 a year. His wages at the firm were being garnished because of a number of judgments obtained against him by creditors. Months earlier, Cusack had met John Reznikoff, a dealer in autographs and stamps, and had learned how valuable the autographs of famous people could be. Cusack told Reznikoff that he had found documents in his father's files that contained the writing and signatures of President John F. Kennedy, Marilyn Monroe, and Robert F. Kennedy (the "Cusack Documents"). According to Cusack, his father, Lawrence Cusack Sr. ("Cusack Sr."), had for years been a secret adviser and confidant to President Kennedy.

According to Cusack and as "corroborated" by the Cusack Documents, Cusack Sr. assisted President Kennedy with a number of intrigues that included (1) the payment of hush money to Marilyn Monroe to cover up an extramarital affair; (2) the cover-up of a supposed secret marriage and subsequent secret divorce prior to Kennedy's marriage with Jacqueline Kennedy; (3) the cover-up of Kennedy's interactions with organized crime figures; (4) Kennedy's attempts to prevent J. Edgar Hoover, the former director of the FBI, from blackmailing him; and (5) Kennedy's addiction to pain killers. The documents depicted prominent figures in the Catholic Church, including Cardinal Spellman, as facilitators of these intrigues.

Cusack represented himself to Reznikoff as a lawyer and as a decorated former Navy lieutenant commander who had served in Vietnam and Cambodia. In one of their early meetings, Cusack wore a bomber jacket with a three-leaf colonel's cluster. The two eventually traveled to Annapolis together where Cusack appeared in full military dress and· exchanged salutes with naval officers. On this occasion, Cusack wore a number of awards on his chest, including a Navy cross, one of the military's highest honors. As their friendship developed, Cusack began to share the documents with Reznikoff, and the two eventually entered into an agreement whereby Reznikoff would act as Cusack's agent. Cusack and Reznikoff then enlisted Thomas Cloud, a dealer in rare documents with access to rich clients, to sell the documents. The three believed that the Cusack Documents could be privately placed with investors and later resold in an auction after they were made public through a book or movie. To attain the high prices for the documents that they sought, the three located a number of collectors of Kennedy memorabilia to "authenticate" the Cusack Documents. In the ensuing years, the three sold between 250 and 275 documents for a total of approximately $7 million. Cusack earned approximately $5 million from the sales, which he invested in a life of luxury.

In time, Cusack came into contact with journalists who were interested in the Cusack Documents. Pulitzer prize-winning author Seymour Hersh wanted to include the Cusack Documents in his new book on the Kennedy presidency. The television network ABC and a producer named Mark Obenhaus wanted to do a documentary on the documents. Once these efforts intensified in 1997, however, the journalists discovered that the documents were forgeries and refused to proceed. In the process, the Cusack Documents were exposed to the public as fakes and Cusack, Reznikoff,

and Cloud were forced to cease selling the documents. In 1997, the scheme came to a close.

The evidence at trial conclusively demonstrated that all of the Cusack Documents are indeed fakes and were authored by Cusack. As a paralegal at Cusack & Stiles, Cusack stole documents from his father's files, the files of Cusack & Stiles, the Surrogate's Court, and the Archdiocese of New York. Cusack altered and embellished these documents with the forged handwriting of President Kennedy and others and sold them as the Cusack Documents.

Several different types of proof supported these conclusions. First, many of the documents are highly implausible on their face. For example, an index card containing a citation to a tax practitioner's article was altered to suggest that Cusack Sr. and President Kennedy shared a grin over how the article could help them foil Hoover. Second, several of the documents contain zip codes which were not in use until after President Kennedy's death. Third, expert analysis revealed that the typefaces used in many of the documents did not exist at the time the documents were supposedly authored. Fourth, additional expert analysis concluded that the handwriting on the documents did not belong to President Kennedy and was likely a forgery made by Cusack. Finally, evidence showed that only Cusack had the ability and opportunity to carry out the fraud.

The evidence at trial also established that the stories Cusack invented about himself and others were false. Cusack Sr. had never had any relationship, professional or otherwise, with President Kennedy. Cusack himself was not a lawyer and had never served in the military.

1. The PSR has relied on the November 1996 edition of the Sentencing Guidelines, the last edition in effect before the collapse of the defendant's scheme, out of the concern that use of the current edition—the November 1998 Sentencing Guidelines—which includes

## DISCUSSION

### I. Objections Related to Adjustments

#### A. Obstruction of Justice—Section 3C1.1

The Government argues that an obstruction of justice adjustment is appropriate on either of two grounds: (1) the defendant's disguising of his handwriting in exemplars provided to the Government in response to a subpoena, and (2) the filing of a pair of civil suits by the defendant against potential witnesses. Cusack disputes that the handwriting exemplars show he intended to obstruct justice. With respect to the filing of civil suits, Cusack argues that there is no evidence of threats by him against any witness and that the record is insufficient to support a finding of specific intent to obstruct justice.

Section 3C1.1 of the Sentencing Guidelines authorizes a two-point adjustment:

If the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense . . . .

U.S.S.G. § 3C1.1.[1] In November 1998, in order to clarify the relationship between the obstruction and the offense, language was added to require explicitly that "the obstructive conduct related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense . . . ." U.S.S.G. § 3C1.1 (1998). *See also United States v. McKay*, 183 F.3d 89, 95 (2d Cir.1999).

■ The willfulness requirement in the text of Section 3C1.1 requires that "the defendant consciously act with the *purpose* of obstructing justice." *United States v. Case*, 180 F.3d 464, 467 (2d Cir.1999) (internal quotation omitted) (emphasis in

the "sophisticated means" specific offense characteristic, would run afoul of the Ex Post Facto Clause. This Opinion also relies upon the 1996 Sentencing Guidelines, and will identify any provision from a later edition to which reference is made.

original). *See also United States v. Reed,* 49 F.3d 895, 900 (2d Cir.1995). In order to impose an adjustment for obstruction of justice, a "specific finding of intent" must be made by the sentencing court where the defendant raises the issue of his state of mind. *United States v. Bradbury,* 189 F.3d 200, 204 (2d Cir.1999) (internal quotation omitted). This finding of intent may be based on circumstantial evidence. *United States v. Sisti,* 91 F.3d 305, 313 (2d Cir.1996).

■ Application Note 3 contains a "non-exhaustive list of examples" of obstruction that includes the following:

(a) threatening, intimidating, or otherwise unlawfully influencing a co-defendant, witness, or juror, directly or indirectly, or attempting to do so;

(b) committing, suborning, or attempting to suborn perjury;

(c) producing or attempting to produce a false, altered, or counterfeit document or record during an official investigation or judicial proceeding;

.　　.　　.　　.　　.

(f) providing materially false information to a judge or magistrate;

(g) providing a materially false statement to a law enforcement officer that significantly obstructed or impeded the official investigation or prosecution of the instant offense . . . .

Where the basis for the adjustment is false testimony, the sentencing court is required to make findings that the witness made false statements regarding a matter material to the instant action with the willful intent to provide materially false testimony. *United States v. Zagari,* 111 F.3d 307, 328–29 (2d Cir.1997). In addition, "an unsworn denial of guilt—even a false and material unsworn denial—cannot become the predicate for an obstruction of justice adjustment." *United States v. Johns,* 27 F.3d 31, 34 (2d Cir.1994) (interpreting language of App. Note 1 to Section 3C1.1, which is currently App. Note 2).

### 1. Handwriting Exemplars

■ The Government first argues that Cusack obstructed justice by giving disguised handwriting exemplars on July 22, 1998 in response to a subpoena. The Second Circuit has noted that

there are few better examples of a classic obstruction of justice than a defendant who refuses to give handwriting samples when compelled by a subpoena. [The defendant's] disguise of his handwriting made difficult the comparison of his writing with that in the [defendant's papers] seized by the government, thus hindering the government in its investigation.

*United States v. Valdez,* 16 F.3d 1324, 1335 (2d Cir.1994).

As evidence that the defendant intentionally disguised his handwriting and thereby obstructed justice, the Government relies on the December 17, 1998 report of handwriting expert and trial witness Gus Lesnevich and a follow-up affidavit from Mr. Lesnevich, as well as the exemplars. Lesnevich's expert report states that the handwriting exemplars "do not contain Mr. Cusack's normal or natural handwriting habits or characteristics and are indicative of intentionally disguised writings." Mr. Lesnevich also provides a chart comparing different samples of Mr. Cusack's handwriting from which, in the opinion of Mr. Lesnevich,

[i]t is obvious . . . that Mr. Cusack lowered his writing skill and abilities, embellished his letter formations and changed his slant of writing when he provided handwriting specimens on July 22, 1998.

In accordance with Lesnevich's conclusion, the exhibits to the report comparing samples of Cusack's handwriting plainly show them to be very dissimilar to the exemplars provided. Finally, Lesnevich's July affidavit states that his conclusions do not change when the defendant's ability to

write in a wide variety of styles is taken into account.

The Court has also examined the handwriting exemplars and the samples of Cusack's daily writing. The record clearly establishes that the defendant intentionally disguised his handwriting in the exemplars he provided on July 22, 1998, with the specific intent of frustrating the pending investigation of him. An adjustment for obstruction of justice is therefore appropriate.

### 2. Filing of Civil Suits

■ The Government argues that the adjustment is also appropriate because of Cusack's filing of two civil suits, one in federal court and another in state court, against defendants that included eventual trial witnesses. Improper threats against witnesses are listed in the application notes and may form the basis for an obstruction adjustment. *See, e.g., United States v. Sovie,* 122 F.3d 122, 128–29 (2d Cir.1997) (obstruction adjustment appropriate for threat to accuser to induce her to drop charges against the defendant); *United States v. Hernandez,* 83 F.3d 582, 585 (2d Cir.1996) (threats made with intent to obstruct may serve as basis for adjustment).

■ Suits were filed in both federal and state court. The federal amended complaint is dated May 6, 1998, and is signed by plaintiffs' attorney. The plaintiffs in the federal actions are Cusack, his wife, Thomas Cloud, and several entities controlled by them. The eighty-page complaint alleges that the Cusack Documents were found in Cusack Sr.'s files and that the documents are of historical importance. The defendants are the television network ABC and a number of entities and individuals affiliated with it, including trial witness and producer Mark Obenhaus and trial witness and journalist Seymour Hersh. The complaint is replete with personal attacks on the defendants based on a documentary that was to be produced that

ultimately became an expose on the Cusack Documents.

The complaint includes the following causes of action against all defendants: fraud based on "ambush journalism," libel, interference with contractual relations, breach of contract, and malicious instigation of a frivolous grand jury investigation. With respect to Hersh, the complaint alleges that after he initially entered into an agreement to produce a television documentary, he and his partners conspired to "denounce [the Cusack Documents], defame plaintiffs and embark on a libelous attack." Obenhaus is alleged to be the head of Lancer, which was created to "keep the dirty work away from ABC" in the production of a documentary that defames the plaintiffs.

The federal suit was dismissed by the Honorable Judge John S. Martin on September 9, 1998, for a failure to follow the basic rules of pleading. At the time of dismissal, Judge Martin gave the following admonition to defendant's criminal counsel:

> I was surprised, after the criminal indictment was filed, that this case was going forward. . . . Should the criminal case result in a conviction, it would be my absolute intention, if this case continues, to write the judge who will have that sentencing and state that, in my view, this pursuance of a civil case in these circumstances—if the facts prove this claim to be fraudulent—is, indeed, an additional obstruction of justice . . . . I thought you should be on notice of this, because this is a dangerous tactic that is being pursued in this case.

Cusack apparently did not replead in response to the dismissal.

A second action was filed in New York state court. The amended state complaint is dated June 10, 1998, and was apparently signed by Cusack's attorney, although the copy provided to the Court is unsigned. The plaintiffs in that suit are Cusack, his wife, Cloud, entities controlled by each of them, and a number of purchasers of the documents. The one hundred and three

page complaint is again based on the historical importance of the documents and the nefarious deeds by the defendants to prove their falsity. Rather than ABC, however, the defendants are individuals and entities related to the television show 60 Minutes, which produced a story that concluded that the Cusack Documents were forgeries. Among the defendants are journalist and trial witness Seymour Hersh; handwriting expert Duayne Dillon, who was retained by 60 Minutes as an expert, appeared in the 60 Minutes show on the Cusack Documents, and eventually became a witness at trial; and Kennedy memorabilia collector and trial witness Robert White. The claims alleged include the following: a fraud claim based on "fraudcast" journalism in connection with the 60 Minutes story, libel based on allegations by the defendants that the documents were forgeries, interference with contractual relations with respect to the purchasers of the documents, breach of a number of agreements, breach of fiduciary duties owed to the plaintiffs, deceptive business practices, intentional and negligent infliction of emotional distress, and malicious instigation of a frivolous grand jury investigation.

With respect to Hersh, the Complaint alleges that he participated in the improper actions of the 60 Minutes defendants and that he made a number of disparaging statements with respect to Cusack and the documents to several different journalists and media outlets. With respect to Dillon, the complaint attacks his credentials as an expert and alleges that his opinion was misrepresented on 60 Minutes. Regarding White, it is alleged that he falsely held himself out as a handwriting expert and made false statements on 60 Minutes defaming the plaintiffs, and that he is liquidating his assets and planning to flee the United States to escape criminal and civil liability. Even after Cusack's guilty verdict, it appears that Cusack and the other plaintiffs in the state action are seeking to continue their civil claims against all of the defendants.

The Government first argues that the filing of these suits amounts to obstruction of justice because the suits constitute improper threats against witnesses. The Court agrees with the Government that the complaints are facially outrageous in light of the overwhelming evidence at trial that Cusack was the author of the documents and invented a relationship between Cusack Sr. and President Kennedy to feed his voracious lifestyle. Cusack did not even defend the authenticity of the documents at the trial. Instead, his counsel argued that someone else, even Cusack Sr., may have fabricated them. The Court also agrees that, under the appropriate circumstances, the filing of a civil suit may support an obstruction of justice adjustment. Nonetheless, the record is insufficient to support a finding that Cusack specifically intended to obstruct justice by filing these lawsuits. The Government has provided no evidence of the context in which the filing of the suits occurred, the status of the investigation at the time of the filing, or any actions or statements by Cusack in connection with the civil suits. As a result, the record will not support a finding that Cusack filed the suits with the specific intent of threatening witnesses to obstruct a criminal investigation.

■ Although it does not make entirely clear the extent to which this argument is independent of the argument based on threats, the Government also argues that an adjustment for obstruction of justice is appropriate on the ground that "[v]erified false statements by [Cusack] in a complaint in a related civil case would logically be on the same footing as civil-case perjury." There can be little doubt as to the falsity of the statements contained in the complaints, but the Government has provided no authority for the proposition that the filing of a civil complaint containing false statements amounts to perjury within the meaning of the Sentencing Guidelines. Instead, the definition of perjury in the Application Note to Section 3C1.1 is mod-

eled on 18 U.S.C. § 1621, and requires a statement under oath that the defendant knows to be false. *See United States v. Bonds,* 933 F.2d 152, 155 (2d Cir.1991). *See also Zagari,* 111 F.3d at 329 (adjustment for perjury in civil deposition upon finding intent and false testimony regarding a material matter). The complaints, which are not even signed by Cusack, are simply not statements made by him under oath and do not constitute perjury. For these reasons, the record is insufficient to support an obstruction of justice adjustment for the filing of the civil suits.

### B. Use of Special Skill—Section 3B1.3

■ The Government seeks an adjustment for use of special skill under Section 3B1.3. That section states that "if this adjustment is based solely on the use of a special skill, it may not be employed in addition to an adjustment under § 3B1.1 (Aggravating Role) ...." U.S.S.G. § 3B1.3. Since the Court has adopted the PSR's recommended adjustment under Section 3B1.1 for the defendant's role in the offense, the Guidelines do not permit it to consider a special skill adjustment.

### C. Abuse of trust—Section 3B1.3

Unlike the special skill adjustment, however, Section 3B1.3 provides that, "[i]f this adjustment is based upon an abuse of a position of trust, it may be employed in addition to an adjustment under § 3B1.1 (Aggravating Role)." U.S.S.G. § 3B1.1. The Government initially sought an adjustment for abuse of trust based on the defendant's "looting" of his father's estate after his father's death in 1985. The Court subsequently gave notice of a possible adjustment for abuse of trust based on Cusack's taking of documents from the Surrogate's Court, the Archdiocese, and the files of Cusack & Stiles. The Government argued that an adjustment may be available for the thefts from Cusack & Stiles and the Archdiocese but not for the theft from the Surrogate's Court. Cusack argues that the listed entities cannot be

called victims since they suffered neither loss of money nor status, and that the adjustment is inapplicable because it only applies where the victim entrusts discretion to the defendant.

■ Section 3B1.3 authorizes an adjustment of two levels "[i]f the defendant abused a position of public or private trust ... in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3. Like any adjustment under Chapter 3, the adjustment may only be based on conduct, or harm resulting from conduct,

> that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense ....

U.S.S.G. § 1B1.3(a)(1). Whether a position is one of trust "is to be viewed from the perspective of the offense victims." *United States v. Laljie,* 184 F.3d 180, 195 (2d Cir.1999); *United States v. Wright,* 160 F.3d 905, 910 (2d Cir.1998). The "primary trait that distinguishes a position of trust from other positions is the extent to which the position provides the freedom to commit a difficult-to-detect wrong." *Laljie,* 184 F.3d at 195 (internal quotations omitted). *See also Wright,* 160 F.3d at 911. "[T]he defendant must have misused discretionary authority that the victim entrusted to him or that another party entrusted to him on the victim's behalf." *United States v. Barrett,* 178 F.3d 643, 646 (2d Cir.1999). *See also United States v. Broderson,* 67 F.3d 452, 456 (2d Cir.1995). While a fiduciary-like position vis-a-vis the victim of the offense ordinarily provides such opportunities for abuse, *see United States v. Ntshona,* 156 F.3d 318, 320–21 (2d Cir.1998); *United States v. Jolly,* 102 F.3d 46, 48 (2d Cir.1996), Section 3B1.3 is not limited to fiduciaries, *Barrett,* 178 F.3d at 646.

Whether an individual or entity is a victim "depends upon the circumstances of the case." *Id.* at 647. In *United States v. Echevarria,* 33 F.3d 175, 177–78 (2d Cir.

1994), the defendant fraudulently held himself out as a physician and treated patients in order to collect payments from third parties for providing medical services. The Second Circuit affirmed the district court's holding that although only third parties suffered the economic impact of the scam, a vulnerable victim adjustment under Section 3A1.1 predicated on the precarious position of the defendant's patients was also appropriate. *Id.* at 180–81. *See also Ntshona,* 156 F.3d at 321. The Second Circuit has interpreted *Echevarria* in the abuse of trust context as holding that the "Sentencing Guidelines recognize that there exist primary and secondary victims of fraud." *Barrett,* 178 F.3d at 647.

█ The Court finds that an abuse of trust adjustment is available based on the theft of documents from the Archdiocese. The trial evidence demonstrates by more than a preponderance of the evidence that Cusack stole five deeds from the Chancery Office, which deeds reflect transfers of property from Kennedy family members to the Archdiocese of New York. Those documents later reappeared as part of the Cusack Documents. As a Cusack & Stiles paralegal, Cusack frequently worked on real estate matters for the Archdiocese of New York, a major client of the law firm. Cusack's work frequently included locating original deeds, normally for photocopying, for properties owned by the church. Those deeds are stored in a vault at the Chancery Office in New York. Lawyers and paralegals from Cusack & Stiles, including Cusack, were given access to these documents. When he reviewed documents in the vault, Cusack was frequently unsupervised.

These facts support an abuse of trust adjustment. Although the primary victims of Cusack's offense are the purchasers of the documents, the Archdiocese is appropriately considered a secondary victim. The Archdiocese experienced the actual loss of deeds. In addition, the Archdiocese as an institution was injured by the defendant's scam. As summarized above, Cusack's fraud placed the Archdiocese in an extremely unfavorable light by suggesting the active complicity of Cardinal Spellman and others in Kennedy's intrigues.

Cusack also occupied a position of trust vis-a-vis the Archdiocese. From the perspective of the Archdiocese, as a trusted representative of its law firm, Cusack was given access to original documents stored in the Chancery and was frequently unsupervised in his review of documents. The Court does not regard Cusack's relatively low position with the firm of Cusack & Stiles to be an impediment to that finding. *Cf. Barrett,* 178 F.3d at 646 ("[T]he enhancement has applied to defendants who were police officers, security guards, babysitters, custodians, and truck drivers."); *United States v. Castagnet,* 936 F.2d 57, 62 (2d Cir.1991) (adjustment appropriate for former junior station agent entrusted with access code). Instead, the discretionary position enjoyed by Cusack with respect to the Archdiocese is sufficiently "fiduciary-like," to justify an abuse of trust adjustment. Finally, since the stolen deeds were used in both the commission of the fraud and the attempted cover-up, "the position of trust ... contributed in some significant way to facilitating the commission or concealment of the offense ...." U.S.S.G. § 3B1.3, App. Note 1.

█ None of the remaining circumstances listed by the Court support the adjustment. The "looting" of the father's estate does not also support the adjustment because those actions, which occurred from 1985 to 1990, are unrelated to the charged offenses and may not be considered as the basis for an adjustment under Section 1B1.3. The Government's assertion that both the "looting" and the Cusack Documents' scheme were part of a continuing effort by the defendant to support his extravagant lifestyle with fraudulently obtained money is unpersuasive. The "looting" between 1985 and 1990 was neither "during" nor "in preparation for" the offense. *See* U.S.S.G. § 1B1.3.

■ With respect to the theft of files from Cusack & Stiles, the law firm, like the Archdiocese, may be considered a secondary victim of Cusack's fraud. The record establishes that Cusack had access both to the firm's file room and to the firm's files that were stored off premises at a warehouse. He used this access to steal documents from firm files related to the firm's involvement in Marilyn Monroe's estate, the Blaine Amendment, and other matters, which he later used in the fraud.[2] Nonetheless, the record contains insufficient evidence to assess whether Cusack held a position in the law firm that provided him with sufficient freedom to commit a "difficult-to-detect" wrong. An abuse of trust adjustment on this ground is therefore inappropriate.

■ Finally, with respect to the Surrogate's Court, the evidence at trial established that the defendant stole a conformed copy of Marilyn Monroe's will from the public estate files maintained by the Surrogate's Court, which document ultimately surfaced as part of the Cusack Documents. Nonetheless, it was also shown at trial that members of the public are permitted access to those files. As a result, it cannot be said that Cusack occupied a fiduciary-like position with respect to the Surrogate's Court. In summary, the Court finds that only one of the four cited grounds supports the adjustment for abuse of trust.

## II Legal Basis for Departures

### A. Departures Under the Sentencing Guidelines

In enacting the Sentencing Reform Act of 1984, Congress sought to achieve three main goals: (1) "to enhance the ability of the criminal justice system to combat crime through an effective, fair sentencing system," (2) "reasonable uniformity in sentencing by narrowing the wide disparity in sentences imposed for similar criminal offenses by similar offenders," and (3) "proportionality in sentencing through a system that imposes appropriately different sentences for criminal conduct of differing severity." U.S.S.G., Ch. 1, Part A.3. Under the Sentencing Guidelines, a sentence is to be imposed according to the Guidelines:

> unless the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described.

18 U.S.C. § 3553(b). *See United States v. Kim,* 896 F.2d 678, 681–82 (2d Cir.1990); *United States v. Coe,* 891 F.2d 405, 408–09 (2d Cir.1989). The Sentencing Commission has cited two purposes for this departure policy:

> First, it is difficult to prescribe a single set of guidelines that encompasses the vast range of human conduct potentially relevant to a sentencing decision.... By monitoring when courts depart from the guidelines and by analyzing their stated reasons for doing so and court decisions with references thereto, the Commission, over time, will be able to refine the guidelines to specify more precisely when departures should and should not be permitted.

> Second, the Commission believes that despite the courts' legal freedom to de-

---

**2.** Many of the documents that Cusack embellished with the Kennedy handwriting and that ultimately became part of the Cusack Documents were taken from Cusack Sr.'s personal files, rather than from the general files of Cusack & Stiles. Cusack & Stiles apparently turned these documents over to Cusack because of a power of attorney granted to him by his mother, who was the sole beneficiary of his father's estate. Since the notice provided by the Court only mentioned the theft of documents from the files of Cusack & Stiles, the Court is not considering the theft of these documents as a basis for an abuse of trust adjustment. Nonetheless, Cusack did occupy a fiduciary-like position with respect to his father's estate. From the perspective of his mother, Cusack, as the holder of a power of attorney, had discretionary authority to manage her affairs and take actions on her behalf.

part from the guidelines, they will not do so very often. This is because the guidelines, offense by offense, seek to take account of those factors that the Commission's data indicate made a significant difference in pre-guidelines sentencing practice.

U.S.S.G. Ch. 1, Part A.4(b).

The Sentencing Guidelines provide for two separate types of departures from the mandatory sentence. *See United States v. Brown,* 98 F.3d 690, 693 (2d Cir.1996) (also noting substantial assistance departure); *United States v. Deutsch,* 987 F.2d 878, 886 (2d Cir.1993); *United States v. Cervantes,* 878 F.2d 50, 53 (2d Cir.1989). First, a district court may depart under Section 4A1.3 if the criminal history category "does not adequately reflect the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes." U.S.S.G. § 4A1.3. Second, a district court may depart under Section 5K2.0 based on the existence of "an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission ...." 18 U.S.C. § 3553(b); U.S.S.G. § 5K2.0.

▇▇▇▇ Notice must be given prior to making any departure. Rule 32, Fed. R.Crim.P., contains a number of notice requirements that must be met prior to the imposition of sentence. *See also United States v. Sisti,* 91 F.3d 305, 310 (2d Cir.1996). Rule 32 has been interpreted to require the Court to give reasonable notice of any ground for departure not identified by the probation department or in a sub-

mission by the Government. *Burns v. United States,* 501 U.S. 129, 138, 111 S.Ct. 2182, 115 L.Ed.2d 123 (1991). "This notice must specifically identify the ground on which the district court is contemplating an upward departure." *Id.* at 138–39, 111 S.Ct. 2182. The Second Circuit has held that this requirement is met where the Court provides notice of the facts upon which it intends to rely and the legal basis under the Guidelines for the departure. *Sisti,* 91 F.3d at 311–12.

### B. Criminal History Departures

Sections 4A1.1 and 4A1.2 address the calculation of a defendant's Criminal History Category. The Sentencing Guidelines, however, do not incorporate all prior conduct into the calculation. *See, e.g.,* U.S.S.G. § 4A1.2(e) (excluding sentences ordering imprisonment for less than one month and one year that were imposed more than ten years before commission of the offense); U.S.S.G. § 4A1.2(h) (excluding foreign convictions). *See also United States v. Delmarle,* 99 F.3d 80, 85 (2d Cir.1996). Section 4A1.3 provides that a court may consider omitted conduct as a basis for a departure:

If reliable information indicates that the criminal history category does not adequately reflect the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes, the court may consider imposing a sentence departing from the otherwise applicable guideline range.

U.S.S.G. § 4A1.3.[3] Although the language of this section might at first appear to

---

**3.** The following paragraph, coming just a few lines later in the same section, contains a slightly different formulation,

> A departure under this provision is warranted when the criminal history category significantly under-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit further crimes.

*See* U.S.S.G. § 4A1.3. *See also id.* Commentary. A close analysis reveals some minor difference between the two formulations.

The first statement of the rule in the Sentencing Guidelines states that this section permits departure based on (1) *seriousness of past conduct* or (2) recidivism. The second statement of the rule permits a departure based on (1) *seriousness of criminal history* or (2) recidivism. There is therefore at least some potential ambiguity as to whether the first prong is addressed to the seriousness of particular criminal acts or the seriousness of the criminal record as a whole. *Cf. United States v. Ashley,* 141 F.3d 63, 69 (2d Cir.1998) (district

provide wide latitude to the district court to address the inadequacy of a defendant's criminal history category, a number of limitations have been imposed by both the Sentencing Guidelines and the Second Circuit.

### 1. What the Sentencing Court May Consider

■ In support of such a departure, a sentencing court may consider "reliable information" that "may include but is not limited to" the following:

(a) prior sentence(s) not used in computing the criminal history category (*e.g.*, sentences for foreign and tribal offenses);

(b) prior sentence(s) of substantially more than one year imposed as a result of independent crimes committed on different occasions;

(c) prior similar misconduct established by a civil adjudication or by a failure to comply with an administrative order;

(d) whether the defendant was pending trial or sentencing on another charge at the time of the instant offense;

(e) *prior similar adult criminal conduct not resulting in a criminal conviction.*

U.S.S.G. § 4A1.3 (emphasis supplied). The district court has broad discretion to determine reliability:

'So long as the sentencing court does not rely on misinformation, its 'discretion is largely unlimited either as to the kind of

---

court should properly consider not just the number but also the nature of the prior offenses).

In addition, the Second Circuit has not explicitly clarified whether the "or" language is disjunctive, such that a departure is appropriate solely on the basis of a finding of either seriousness of criminal history or recidivism, or conjunctive, such that a departure is only justified where both elements are present. *See, e.g., United States v. Franklyn*, 157 F.3d 90, 100 (2d Cir.1998) (affirming predominantly on prospects of recidivism); *United States v. Kassar*, 47 F.3d 562, 566 (2d Cir.1995) (same); *United States v. Coe*, 891 F.2d 405, 413 (2d Cir.1989) (suggesting that past criminal conduct and likelihood of recidivism are

information [the court] may consider, or the source from which it may come ....'[4]

*United States v. Larson*, 112 F.3d 600, 605–06 (2d Cir.1997) (quoting *United States v. Sisti*, 91 F.3d 305, 312 (2d Cir. 1996)). *See also United States v. Delmarle*, 99 F.3d 80, 84 (2d Cir.1996); *United States v. Soliman*, 889 F.2d 441, 444–45 (2d Cir.1989).

Despite this discretion and the express statement in the Guidelines that the district court is not "limited to" the enumerated information, the Second Circuit has interpreted this section as placing some limitations on the district court. One significant limitation is with respect to conduct not resulting in a conviction. In *United States v. Chunza–Plazas*, 45 F.3d 51, 56 (2d Cir.1995), the Second Circuit held that prior adult criminal conduct not resulting in a conviction may only be considered where it is "similar" to the criminal conduct at issue, as stated in Section 4A1.3(e). As a result, in *Chunza–Plazas*, the defendant's prior homicide, terrorism, and drug trafficking in Columbia could not be considered as the basis for a horizontal departure under Section 4A1.3, since those offenses were not similar to the possession of false immigration papers, the conduct for which the defendant was being sentenced. *See id.* at 57. In so holding, the Second Circuit distinguished its decision in *United States v. Diaz–Collado*, 981 F.2d 640, 644 (2d Cir.1992), which permitted the

---

distinct by holding that the procedural requirements are the same regardless of which reason is used).

4. It is worth noting that the Sentencing Guidelines explicitly state that the district court is not bound by the relevant conduct rules contained in Section 1B1.3 when considering departures under Sections 4A1.3 or 5K2.0. Instead, "[f]actors in Chapters Four and Five that establish the guideline range shall be determined on the basis of the conduct and information specified in the respective guidelines." U.S.S.G. § 1B1.3(b). *See also United States v. Hernandez*, 941 F.2d 133, 138 (2d Cir.1991).

use of a dissimilar prior conviction, on the ground that the similarity requirement only applies where the prior conduct did not result in a conviction. *Chunza–Plazas,* 45 F.3d at 57.

The similarity requirement was also addressed by the Second Circuit in *United States v. Mayo,* 14 F.3d 128, 131 (2d Cir. 1994), which held that two arsons involving the defendant's financial documents were sufficiently similar to the series of frauds for which the defendant was being sentenced. *Mayo* stated that the similarity requirement does not require that the prior conduct be "identical" and instead upheld the district court's conclusion that the prior "conduct was sufficiently similar to the frauds prosecuted in the present case to warrant an upward departure .... " *Id.* at 131–32.

### 2. *"Past Conduct" Requirement*

■■■ Another implied limitation is that a court may not consider any conduct related to the current offense as a basis for a horizontal departure. In *United States v. Hernandez,* 941 F.2d 133 (2d Cir.1991), the Second Circuit reversed the decision of the district court, which had found that in spite of his lower criminal history category, the defendant should be sentenced as a career offender because of the otherwise criminal acts he committed *in connection* with the offense. The Second Circuit held that

> In assigning [the defendant] this category, the district judge made it clear that he was not attempting to sentence [him] as a career offender, but was instead relying on relevant conduct. However, while it is proper for a district court to consider some relevant conduct in determining a defendant's criminal history category, it may do so only with respect to the circumstances surrounding the defendant's prior convictions, and not with respect to the current offense.

*Id.* at 139. *Hernandez* also stated that Section 4A1.3 is limited to prior conduct:

> [i]t is § 4A1.3 that articulates the conduct relevant for determining criminal history, and that section makes it clear that *only prior conduct may be considered.* While the section allows the sentencing judge to consider a defendant's "likelihood of recidivism," this determination, too, should be decided on the basis of the defendant's prior conduct only. In short, current criminal conduct should not be used in determining a defendant's criminal history category; *the "history" to be considered is prior conduct.*

*Id.* (emphasis supplied) (internal citations omitted). In a decision nearly contemporaneous with *Hernandez, United States v. Keats,* 937 F.2d 58, 65–66 (2d Cir.1991), the Second Circuit held that *post-arrest* conduct can also be considered for purposes of a departure under Section 4A1.3. Specifically, the Second Circuit affirmed the district court's consideration of crimes that occurred subsequent to the crime for which the defendant was being sentenced. In so holding, the *Keats* panel noted the importance of "flexibility under the guidelines" and focused on the purpose of the Section 4A1.3 departure:

> Both the language of guideline § 4A1.3 and our interpretation of that section make clear that the critical question under § 4A1.3 is whether the criminal history category adequately reflects the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes. *If that question can be answered in the negative, it is not unreasonable to depart from the guidelines.* This view is consistent with that of other courts which have held that an upward departure in the criminal history category can be based on post-arrest conduct.

*Id.* at 66.

A fair reading of *Keats* and *Hernandez* suggests that the core limitation on the use of conduct under Section 4A1.3 is not the temporal relationship of the conduct to the sentenced offense, but rather that the con-

duct be separate from the offense for which the defendant is being sentenced, because conduct related to the offense is taken into account by other portions of the Sentencing Guidelines.[5] As stated in *United States v. Kim*,

> [b]ly focusing on the 'prior' misconduct, the Commission was obviously contemplating acts not relevant to the offense of conviction, since those acts would enter into the "relevant conduct" analysis used to determine the base offense level and specific offense characteristics ....

896 F.2d 678, 683 (2d Cir.1990).[6]

### 3. Procedural Limitations

■ In making a criminal history departure, the Second Circuit has generally required that a district court "state its reasons both for departing and, with some specificity, for the extent of departure." *United States v. Tropiano*, 50 F.3d 157, 162 (2d Cir.1995) (internal quotation omitted). Earlier Second Circuit cases and one more recent decision, *Tropiano*, held that to meet this requirement, the sentencing court should proceed "sequentially from the criminal history category determined by the defendant's criminal history point score through each higher criminal history category until it settles upon a category that fits the defendant." *Id.* at 162. *See also United States v. Deutsch*, 987 F.2d 878, 887 (2d Cir.1993); *United States v. Stevens*, 985 F.2d 1175, 1185 (2d Cir.1993); *United States v. Nichols*, 912 F.2d 598, 604 (2d Cir.1990); *United States v. Cervantes*, 878 F.2d 50, 53–54 (2d Cir.

1989). Under this approach, a sentencing court was prohibiting from "leaping" seven offense levels because that "circumvent[ed] the strictures of a § 4A1.3 horizontal departure by treating criminal history concerns as aggravating circumstances that affect offense level under § 5K2.0." *Tropiano*, 50 F.3d at 163. Even under this mechanical approach, however, the district court was not required to affix point values to its findings of prior misconduct. *See United States v. Jakobetz*, 955 F.2d 786, 806 (2d Cir.1992).

With the exception of *Tropiano*, more recent Second Circuit cases have held that a sentencing court is not required to follow a mechanistic, level-by-level approach. *See United States v. Thomas*, 6 F.3d 960, 964 (2d Cir.1993) (both generally under Section 4A1.3 and for departures from criminal history category VI). *See also United States v. Harris*, 13 F.3d 555, 559 (2d Cir.1994) (holding of *Thomas* with respect to category VI departures not altered by 1992 amendments). Instead, these decisions require only that

> the district court's findings and reasons are sufficient to demonstrate that this departure was not arbitrary. The court's explanation [must] inform[ ] the defendant of the reason for his sentence and provide[ ] an ample basis on which we can review the departure.

*United States v. Franklyn*, 157 F.3d 90, 100 (2d Cir.1998) (internal quotation omitted). *See also United States v. Ashley*, 141 F.3d 63, 70 (2d Cir.1998) (central ques-

---

5. A corresponding limitation is that a horizontal departure is inappropriate if the basis for the departure is specifically contemplated by another section of the Sentencing Guidelines, since a horizontal departure on that basis would result in double counting. *See United States v. Stevens*, 985 F.2d 1175, 1187 (2d Cir.1993).

6. Further support for this interpretation can be found in *United States v. Coe*, 891 F.2d 405, 409 (2d Cir.1989). *Coe* held that although Section 4A1.3(e) refers to "prior" misconduct, that term should not be interpreted to apply to misconduct prior to the offense for

which the defendant is sentenced, if all of the conduct is part of the same series:

> [W]here a defendant commits a series of similar crimes, it would be elevating form over substance to regard the early episodes in the series as "prior criminal history" simply because the defendant pled guilty to the last in the series, rather than the first. *Id.* at 409–10. The court added that such "prior conduct" may be considered under the Guidelines as "relevant conduct" under Section 1B1.3(a)(2), under Section 1B1.2(a), and as a basis for a departure under Section 5K2.0. *Id.* at 410.

tion is whether reasons are sufficient to justify magnitude of departure); *United States v. Kassar,* 47 F.3d at 562, 566 (2d Cir.1995) ("[S]o long as the reasons supporting a departure are fully explained, a mechanistic, step-by-step procedure is not required."); *United States v. Stevens,* 985 F.2d 1175, 1185 (2d Cir.1993) (acknowledging different requirements of case law and stating that district court "must state its reasons both for departing and, with some specificity, for the extent of a multi-step CHC departure"). Under this case law, it is clear that a district court must adequately explain the reasons for the extent of any departure it does make.

### C. Aggravating Circumstances Departures

■ The second general departure provision under the Sentencing Guidelines, Section 5K2.0, reads as follows:

> Under 18 U.S.C. § 3553(b) the sentencing court may impose a sentence outside the range established by the applicable guideline, if the court finds "that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described."

U.S.S.G. § 5K2.0. The Guidelines list a series of specific circumstances that may be the basis for a departure.[7] U.S.S.G. § 5K2.1–18. This enumeration is not intended to be exhaustive:

> Circumstances that may warrant departure from the guidelines pursuant to this provision cannot, by their very nature, be comprehensively listed and analyzed in advance. The controlling decision as to whether and to what extent departure is warranted can only be made by the courts.

U.S.S.G. § 5K2.0. The Court may also depart on the basis of factors considered by

the Guidelines where unusual circumstances exist:

> Similarly, the court may depart from the guidelines, even though the reason for departure is taken into consideration in the guidelines (*e.g.*, as a specific offense characteristic or other adjustment), if the court determines that, in light of unusual circumstances, the guideline level attached to that factor is inadequate.

U.S.S.G. § 5K2.0. Nonetheless,

> [t]o determine whether a circumstance was adequately taken into consideration by the Commission, Congress instructed courts to consider only the sentencing guidelines, policy statements, and official commentary of the Sentencing Commission.

*Koon v. United States,* 518 U.S. 81, 92–93, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996) (internal quotation omitted). Despite the discretion this language would appear to confer on the district court, "[b]efore a departure is permitted, certain aspects of the case must be found unusual enough for it to fall outside the heartland of cases in the Guideline." *Koon,* 518 U.S. at 98, 116 S.Ct. 2035. *See also United States v. Galvez–Falconi,* 174 F.3d 255, 258 (2d Cir. 1999); *United States v. Chabot,* 70 F.3d 259, 260 (2d Cir.1995) (per curiam) ("[A] court should exercise its discretion to depart only under extraordinary circumstances."). More specifically, the Second Circuit has followed then Chief Judge Breyer's analysis of three categories of departures:

> (i) "encouraged departures" where the Guidelines specifically list factors to be considered for departure purposes; (ii) "discouraged departures," where the factors in question were taken into account by the Commission but may be present in such an "unusual kind or degree" as to take the case out of the "heartland" of the crime in question and to justify a departure; and (iii) "forbid-

---

**7.** The Guidelines also list a number of factors that a sentencing court may not consider, including race, sex, national origin, creed, religion, socioeconomic status, and economic hardship. *See* U.S.S.G. § 5H1.1 et. seq.; *Koon,* 518 U.S. at 93, 116 S.Ct. 2035.

den factors" where the factor in question can never justify a departure.

*United States v. Broderson,* 67 F.3d 452, 458 (2d Cir.1995) (quoting *United States v. Rivera,* 994 F.2d 942, 948–949 (1st Cir. 1993)).

Although some early decisions suggested that a more mechanistic procedure for Section 5K2.0 departures might be required, more recent cases show a trend away from "rigid exactitude." *Thomas,* 6 F.3d at 965. *See also United States v. Mora,* 22 F.3d 409, 413 (2d Cir.1994); *United States v. Campbell,* 967 F.2d 20, 25–26 (2d Cir.1992). "[T]he district court must state the specific reason for the imposition of a sentence different from that described by the Guidelines." *United States v. Amaya–Benitez,* 69 F.3d 1243, 1246 (2d Cir.1995) (internal quotation omitted). More specifically, the Second Circuit conducts the following three-part inquiry:

> [F]irst we determine *de novo* whether this factor is related to the offense and not adequately considered by the Sentencing Commission; second we determine whether the district court's departure is supported by findings of fact; last we ascertain whether the district court adequately explained how it determined the extent of its departure.

*United States v. Malpeso,* 115 F.3d 155, 169 (2d Cir.1997). Finally, the review as to the extent of the departure is generally based on an inquiry as to the reasonableness of the sentencing court's departure. *See United States v. Sisti,* 91 F.3d 305, 316 (2d Cir.1996) (internal quotations omitted). *See also United States v. Ventura,* 146 F.3d 91, 98 (2d Cir.1998) (departure was "within the sentencing judge's discretion").

As stated, misconduct unrelated to the offense of conviction may not form the basis for a departure under this section. *See Tropiano,* 50 F.3d at 164. In determining whether the factor is related, the district court is not limited to relevant conduct as that term is defined by the Sentencing Guidelines:

> An upward departure under U.S.S.G § 5K2.0 is permitted for misconduct not leading to conviction if the defendant committed acts related in some way to the offense of conviction, even though not technically covered by the definition of relevant conduct.

*Sisti,* 91 F.3d at 314 (internal quotations omitted). *See also United States v. Uccio,* 917 F.2d 80, 86 (2d Cir.1990).

### D. Recidivism as a Basis for a Section 5K2.0 Departure

██ The previous discussion makes clear that the Second Circuit has generally enforced a "rigid demarcation" between the two departures. *Tropiano,* 50 F.3d at 163. *See also United States v. Coe,* 891 F.2d 405, 409 (2d Cir.1989) (noting that the Second Circuit did not distinguish procedurally between the two kinds of departures until its decision in *United States v. Cervantes,* 878 F.2d 50 (2d Cir.1989)). Under the Second Circuit demarcation, a Section 5K2.0 departure may only be based on offense-related conduct, while a Section 4A1.3 departure may only be based on conducted unrelated to the offense. A remaining issue, however, is whether offense-related conduct indicative of recidivism, a Section 4A1.3 concern, may also be considered under Section 5K2.0.

Structural aspects of the Sentencing Guidelines suggest that a Court should be entitled to consider offense-related conduct indicative of recidivism as a basis for a departure under Section 5K2.0. Although Section 4A1.3 contains a number of limitations on what the sentencing court may consider, no such limitations are explicitly contained in Section 5K2.0. As discussed above, the significant limitation on Section 5K2.0 departures is that they are only available in the "unusual" situation where a factor is not otherwise considered by the Guidelines or the conduct falls outside the heartland already addressed by the Guidelines. Under Section 5K2.0 "[u]nless [a] departure is expressly forbidden by statute or the Guidelines, it may be considered

in any circumstances not adequately taken into account in kind or degree by the Commission." *United States v. Core*, 125 F.3d 74, 79 (2d Cir.1997). In addition, the introduction to Chapter 5 indicates that a "court should impose a sentence sufficient, but not greater than necessary, to comply with the statutory purposes of sentencing. 18 U.S.C. § 3553(a)." U.S.S.G., Ch. 5, Introductory Commentary. Section 3553(a) states that the court should consider, among other factors, "the history and characteristics of the defendant," and that the sentence imposed should "promote respect for the law," "afford adequate deterrence to criminal conduct," and "protect the public from further crimes." 18 U.S.C. § 3553(a). Each of these purposes is related to recidivism. Although the issue of criminal recidivism is within the province of Section 4A1.3, recidivism indicated by offense-related conduct is not. Under the normal logic applicable to Section 5K2.0, the Guidelines would appear to authorize, in an exceptional case, offense-related conduct indicative of recidivism as the basis for a Section 5K2.0 departure.

Furthermore, the Second Circuit in *United States v. Mora*, 22 F.3d 409, 413 (2d Cir.1994), upheld a departure by a sentencing court based on recidivism concerns in the supervised release context, apparently under Section 5K2.0. Specifically, the district judge upwardly departed based "on her belief that the Sentencing Commission failed to take into account the serious problem of drug offender recidivism when formulating the supervised release guidelines." *Id.* While not discussing the basis in the Guidelines for the departure, the Second Circuit affirmed the departure as follows:

Mora [the defendant] argues that because the Sentencing Commission specifically considered the need to impose increased punishment on recidivist drug traffickers in its criminal history categories, that concern should not also factor into the term of supervised release. In general, issues of recidivism in sentenc-

ing are dealt with through the criminal history categories. However, we have hesitated to draw negative inferences of the type suggested by Mora. Moreover, the Sentencing Reform Act instructs courts to consider such factors as "the history and characteristics of the defendants," and the need "to protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(1), (a)(2)(c) (1985). Accordingly, *we find that the District Court was entitled to depart from the Guidelines' range in order to craft a sentence that appropriately considered Mora's potential for recidivism and the perceived threat she posed to society.*

*Id.* at 413–14 (emphasis supplied) (internal citations omitted). Several Second Circuit decisions are consistent with the underlying assumption of *Mora* that the characteristics of the defendant or concerns related to recidivism are valid bases for departures under Section 5K2.0. *See, e.g., United States v. Herman*, 172 F.3d 205, 207–208 (2d Cir.1999) (affirming availability of downward departure based on drug rehabilitation in extraordinary circumstances and noting relevance of recidivism for rehabilitation finding); *United States v. Cornielle*, 171 F.3d 748, 753–54 (2d Cir.1999) (upholding availability of downward departure based on extraordinary rehabilitation in general); *United States v. Bryson*, 163 F.3d 742, 748–49 (2d Cir.1998) (same); *United States v. Core*, 125 F.3d 74, 76 (2d Cir.1997) (noting that downward departure may be based on post-conviction rehabilitation because the "Guidelines did not adequately consider rehabilitation efforts undertaken at various times"); *United States v. Merritt*, 988 F.2d 1298, 1309 (2d Cir.1993) ("This court has increasingly recognized the importance of departure by reason of offender characteristics for the fair fulfillment of the sentencing scheme ...."); *United States v. Rogers*, 972 F.2d 489, 494 (2d Cir.1992) (upholding possibility of downward departure on ground that "[i]f a career offender is eligible for a depar-

ture based on past conduct, which is the basis for his status as a career offender, we can see no reason why he should not be similarly eligible for a departure based on present conduct, which is the basis for his conviction and sentence"). *But see United States v. Farah,* 991 F.2d 1065, 1070 (2d Cir.1993) (downward departure from Category I criminal history based on low likelihood of recidivism prohibited under Section 5K2.0 since "the Commission intended that consideration of a defendant's propensity for recidivism should occur in connection with the calculation of, and possible departure from, his criminal history category").

Two of the cases that contain the most forceful statement of the "rigid demarcation" between the two departure sections contain some language that could be interpreted to prohibit consideration of offense-related conduct indicative of recidivism as a basis for a departure under Section 5K2.0. *See, e.g., Tropiano,* 50 F.3d at 163 (suggesting that a departure may have been available under Section 5K2.0 if the "district court had stated ... an alternative reason, other than recidivism, for reaching the same result"); *Deutsch,* 987 F.2d at 887 (stating that "past criminal conduct and likelihood of recidivism" are grounds for a departure under Section 4A1.3 rather than Section 5K2.0). In each case, however, the district court indicated that it was departing because of criminal history and recidivism concerns, but the court failed to indicate the departure section on which it was relying and did not heed the procedural requirements then applicable to a Section 4A1.3 departure. *Tropiano,* 50 F.3d at 161; *Deutsch,* 987 F.2d at 887. Properly understood, these cases therefore stand for the proposition that if a district court is making a Section 4A1.3 departure, it must so state and adhere to the procedural requirements of that section. Neither case speaks specifically to the permissibility of a departure under Section 5K2.0 based on offense-related conduct indicative of recidivism. *Cf. United States v. Rivers,* 50 F.3d 1126, 1130

(2d Cir.1995) (holding that *Deutsch* and other cases do not preclude vertical departures for criminal offenders because "these authorities stand only for the sensible proposition that departures based on criminal history factors should be carried out by increasing or decreasing only the sentencing variable affected by the defendant's criminal history").

In sum, under the Guidelines themselves, criminal recidivism indicated by offense-related conduct would appear to be a valid basis for a departure under Section 5K2.0. In addition, several Second Circuit decisions generally authorize the consideration of a defendant's characteristics as a basis for a Section 5K2.0 departure, a broad category that may include characteristics of the defendant indicative of a defendant's propensity to commit other crimes.

## III Availability of Particular Departures

### A. Diminished Capacity

 The defendant was examined by two psychiatrists retained by defense counsel, Dr. Frank T. Miller and Dr. Dennis Wolf. The defendant argues that the conclusions reached by both psychiatrists regarding the defendant's "diminished mental capacity," his "mental impairment," and his process of "derealization" support a downward departure.

Section 5K2.13 authorizes the following departure for diminished capacity:

> If the defendant committed a non-violent offense while suffering from significantly reduced mental capacity not resulting from voluntary use of drugs or other intoxicants, a lower sentence may be warranted to reflect the extent to which reduced mental capacity contributed to the commission of the offense, provided that the defendant's criminal history does not indicate a need for incarceration to protect the public.

U.S.S.G. § 5K.13. There are two elements to a downward departure under this section: " 'reduced mental capacity and a causal link between that reduced capacity and the commission of the charged offense.' " *United States v. Piervinanzi,* 23 F.3d 670, 684 (2d Cir.1994) (quoting *United States v. Prescott,* 920 F.2d 139, 145–46 (2d Cir.1990)).

The Court has carefully considered both of the psychiatric evaluations of the defendant. In the Court's view, the evaluations establish neither that the defendant suffered from reduced mental capacity or that any reduction in capacity was the cause of the charged offense. Moreover, each analysis is seriously undermined to the extent either author placed any reliance on the defendant's description of the offense conduct. From their reports it is clear that the defendant falsely described to each of them his participation in the crime for which he was convicted. In any event, the Court has carefully read the two evaluations and, exercising its discretion, declines to depart.

### B. Nonmonetizable Loss

■ The Government argues that a departure for nonmonetizable loss is appropriate under Section 5K2.0 on the basis of *United States v. Spiegelman,* 4 F.Supp.2d 275 (S.D.N.Y.1998). Cusack argues that *Spiegelman* is distinguishable on two grounds. First, Cusack argues that while the monetary valuation in *Spiegelman* was unreliable, there is no such valuation problem here, since the substantial monetary loss captures the seriousness of the conduct. Second, Cusack argues that the materials stolen in *Spiegelman* were unique, resulting in permanent injury, while the discovery of the fraudulent nature of the papers here eliminates any risk of injury to history.

The defendant in *Spiegelman* pleaded guilty to theft of a large number of rare documents from Columbia University, the value of which was fixed by the plea agreement at $1.3 million. *Id.* at 277. Many of these documents were not recovered. The Honorable Lewis A. Kaplan considered extensive evidence that the loss of the documents "deprives [the academic community] of raw materials important to the advancement of human knowledge and thus deprives all of us of the benefits of their insights and discoveries" and found that the appraisal value of documents, which was the basis for the $1.3 million figure, was an inadequate measure of the documents' value. *Id.* at 279. Judge Kaplan observed that "the extent to which the economic value of the material stolen ... adequately captures the gravity of [the] offense is central to the issue whether a departure is appropriate here." *Id.* at 282. Judge Kaplan related the intended loss to the "heartland" of Section 2B1.1, the applicable loss provision, as follows:

> In any event, there is no denying that the "heartland" of Section 2B1.1 is garden variety theft—theft of money or fungible property—which causes only economic harm and impacts only the immediate victim. This case manifestly is exceptional by virtue of the substantial and unquantifiable non-economic harm risked and caused both to Columbia and others. It is outside the heartland almost by definition.

*Id.* at 291. As a result, he concluded that a departure was appropriate under Section 5K2.0. *Id.* at 290.

It is worth noting that in *Spiegelman,* Judge Kaplan was considering the Guidelines sections dealing with theft and property loss rather than fraud. Judge Kaplan based his departure on a finding that the defendant "knowingly risked and caused substantial non-monetary damage." *Id.* at 290. Since the loss sections applicable to the underlying crime did not contain a "reasonably foreseeable" requirement, Judge Kaplan concluded that no such requirement was necessary to support a departure. *See id.* at 289–90 & n. 89.

By contrast, the loss provisions applicable to fraud indicate that such a "reasonably foreseeable" requirement should be

applied. The loss provision for fraud, Section 2F1.1, uses the basic definition of loss for theft, but with a number of refinements. For example, Application Note 8 states that

> Consistent with the provisions of § 2X1.1 (Attempt, Solicitation, or Conspiracy), if an intended loss that the defendant was attempting to inflict can be determined, this figure will be used if it is greater than the actual loss.

U.S.S.G. § 2F1.1, App. Note 8. Application Note 11, the departure provision, is also different in that it incorporates a concept of "reasonably foreseeable" loss:

> In cases in which the loss determined under subsection (b)(1) does not fully capture the harmfulness and seriousness of the conduct, an upward departure may be warranted. Examples may include the following:
>
>> (a) a primary objective of the fraud was non-monetary; or the fraud caused or risked *reasonably foreseeable,* substantial non-monetary harm;
>
> . . . .

Application Note 11 to U.S.S.G. § 2F1.1 (emphasis supplied). *See also United States v. Khan,* 53 F.3d 507, 518 (2d Cir. 1995) (applying and finding that defendant met requirement by creating a substantial health risk to patients). Any nonmonetizable loss departure in a fraud case must include a finding that the loss was "reasonably foreseeable" to the defendant.

■■■ Here, the record does not support a departure for nonmonetizable loss. Initially, there is nothing in the record that suggests that the calculated loss of $7 million is inadequate. Unlike *Spiegelman* therefore, the record does not support a finding that the loss in the case is so unusual so as to take it out of the heartland of cases contemplated by the Guidelines. If *Spiegelman* is a case of relatively

small economic harm and significant noneconomic harm, this is a case of both significant economic harm and significant noneconomic harm. As pointed out by counsel for defendant, the Cusack Documents only commanded the high prices that they did because of their purported historical significance. The amount paid therefore very likely incorporates much of this purported significance. At the very least, no contrary evidence has been presented to the Court.

There is also little basis for a finding that the nonmonetizable loss was "reasonably foreseeable." While Cusack held the subjective belief that the documents would change history, that was not a reasonably held belief. Instead, the only reasonable belief was that the documents, due both to their inherent implausibility as well as a number of technical defects that reveal themselves upon forensic examination, would be exposed as a fraud before long. This is in fact what happened. Once the documents were given a wider audience and came under independent scrutiny, they were quickly revealed as frauds. For either reason, therefore, a departure based on nonmonetizable loss would be inappropriate.

## C. *Departures Noticed by Court*

The Court originally gave notice of the following factual bases for a criminal history departure: (1) defendant's "looting" of his father's estate after the death of his father in 1985;[8] (2) defendant's willingness to design a fraud that resulted in damage to his father's reputation and the reputation of the law firm at which he worked; (3) defendant's willingness to design a fraud that would damage the reputation and historical evaluation of public figures including Joseph Kennedy, Robert Kennedy, John F. Kennedy, J. Edgar Hoo-

---

8. As used by the Court and understood by the parties, this "looting" refers to the defendant's theft of assets from his father's estate, of which his mother was the sole beneficiary, that occurred between his father's death in

1985 until 1990. The "looting" does not refer to the taking of his father's personal files from Cusack & Stiles, which were also apparently the property of his father's estate, during the course of the scheme.

ver, Marilyn Monroe, and Cardinal Spellman; and (4) defendant's willingness to put at risk the reputation and livelihood of others, including John Reznikoff, Thomas Cloud, Seymour Hersh, and Mark Obenhaus. The Court also provided notice of a possible departure for the wearing of the naval uniform and various military medals and insignia. Subsequently, the Court gave notice that it would be considering this same conduct as a basis for a departure under Section 5K2.0.

### 1. Criminal History Category Departure; Looting of Cusack Sr.'s Estate

■ As discussed above, offense-related conduct may not be considered as a basis for a criminal history departure. Because all but one of the circumstances raised by the Court are offense-related conduct, a criminal history category departure is not available based on any of the circumstances with the exception of the "looting" of Cusack Sr.'s estate. The defendant objects by arguing that there is an insufficient factual record to support the departure.

The following facts have been established by a preponderance of the evidence. Cusack Sr. died on October 28, 1985, leaving his wife as the sole beneficiary of his estate. Beginning in or around December 1985, Cusack obtained a series of powers of attorney from his mother granting him authority to transact business on her behalf. Cusack then controlled the assets in his father's estate. From 1986 to 1990, the estate had an available cash flow of at least $723,000, plus interest. Approximately $105,000 of this amount was generated by mortgages taken out by Cusack on the family home. The defendant has accounted for at most $220,000 of this money as relating to family expenses.[9] As a result, the defendant has not accounted for over

$500,000 of the estate funds that he controlled.

The record establishes that the defendant took this money and converted it to his own use. From 1986 to 1990, Cusack led a luxurious life style, including owning or leasing various high-priced automobiles, maintaining multiple residences, and purchasing expensive clothes and accessories. During 1986, the statements from Cusack's bank account show substantial transactions. For example, in December 1986 there were total deposits of $20,000 and total withdrawals of $29,000. Both the defendant's lifestyle and these transactions are inconsistent with his annual salary of between $25,000 and $35,000. No other possible source of income has been identified with any credible evidence.

During this same period, Cusack's mother was in a precarious financial position and frequently pleaded with the defendant to send her money. From time to time, Cusack would send her between $500 and $1000. Finally, in 1995, Cusack's brother sent a letter to the law firm of Cusack & Stiles, which had represented the estate, that raised questions about Cusack's handling of estate funds. At a meeting held with his brother and Cusack & Stiles attorneys, the defendant promised to provide an accounting. No such accounting was ever provided.

This theft of assets justifies a Criminal History Category departure under the Sentencing Guidelines. Initially, the "looting" constitutes prior criminal conduct, since the record establishes by a preponderance of the evidence that Cusack stole assets from his father's estate that rightfully belonged to his mother. Furthermore, this prior criminal conduct is sufficiently similar to the instant offense because it involves deceptive conduct motivated by Cusack's greed to take money

---

9. The defendant never provided the accounting he promised his family and the attorneys at Cusack & Stiles in 1995 for his handling of his father's estate, nor did he provide any records of estate finances in response to Government subpoenas until a few weeks before sentence. On September 2, 1999, his wife provided some documents reflecting less than $200,000 of estate funds spent on the defendant's mother or siblings.

from others under false pretenses. Both the estate theft and the instant offense involve Cusack acting as a criminal opportunist who uses his family connections to enrich himself. In each instance, the defendant used a power of attorney to take control of assets from his father's estate that were not rightfully his, which he then converted to his own purposes. The Court therefore believes that a Criminal History Category of I is inadequate and that a horizontal departure of one category is necessary to take into account the prior serious, similar criminal activity described here.

### 2. Character Departure

With respect to the Section 5K2.0 departure noticed by the Court, the "looting" of the father's estate may not be considered. Under the Second Circuit case law discussed above, a Section 5K2.0 departure is only appropriate based on conduct "related in some way to the offense of conviction." *Sisti*, 91 F.3d at 314. There is no factual relationship between the alleged looting and the offense of conviction. As such, no departure is available under Section 5K2.0.[10] Nonetheless, the other circumstances are appropriately considered as grounds for a Section 5K2.0 departure. In the Court's view, those circumstances support a departure based on the defendant's character, in particular his nearly sociopathic disregard for the effect of his actions on others.

10. The Government also noticed a departure under Section 5K2.0 predicated on the defendant's "looting" of his father's estate on the ground that victimizing the defendant's mother "is an aggravating factor that warrants sentence enhancement." Since again this conduct is unconnected to the underlying offense, it may not be considered under Section 5K2.0.

11. Judge Leval also notes that Part 5H of the Guidelines, entitled "Specific Offender Characteristics" addresses the ability of the sentencing court to consider the defendant's age; education and vocational skills; mental, emotional, and physical condition; and other characteristics, but does not explicitly men-

In *United States v. Merritt*, 988 F.2d 1298, 1308 (2d Cir.1993), Judge Leval noted that "as to defendant characteristics, the Guidelines contain virtually no categorizing instructions."[11] Nonetheless,

> the Sentencing Reform Act did not abolish consideration of the character of the defendant in sentencing .... In fact ... the Act clearly ordered that the characteristics of the defendant were to be a central consideration in the fashioning of a just sentence.

*Merritt*, 988 F.2d at 1307.[12] According to Judge Leval, 18 U.S.C. § 3553(c) instructs the sentencing court to consider "the offense and the history and characteristics of the defendant" and 28 U.S.C. § 994(b)(1) directs the Sentencing Commission to establish a sentencing range "for each category of offense involving each category of defendant." *Id.* at 1306–07. Moreover, Section 1B1.4 explicitly authorizes a court to consider the defendant's character in making a departure:

> In determining the sentence to impose within the guideline range, or whether a departure from the guidelines is warranted, the court may consider, without limitation, any information concerning the *background, character and conduct* of the defendant, unless otherwise prohibited by law.

U.S.S.G. § 1B1.4 (emphasis supplied).

Based on these authorities, Judge Leval concluded in *Merritt* that

tion "personal characteristics like kindness or cruelty, generosity or greed, candor or dishonesty, forthrightness or manipulativeness." *Merritt*, 988 F.2d at 1308.

12. Although no other Second Circuit decision has analyzed the issue as extensively, several other cases have pointed to the validity of considering the defendant's character for purposes of a departure. *See United States v. Rahman*, 189 F.3d 88, 153 (2d Cir.1999); *United States v. DeRiggi*, 45 F.3d 713, 718 (2d Cir.1995); *United States v. Jones*, 30 F.3d 276, 288–89 (2d Cir.1994); *United States v. Jagmohan*, 909 F.2d 61, 65 (2d Cir.1990).

the nearly total absence of categorization of offender characteristics does not mean that the Commission sought to overrule or disregard Congress' instruction that offender characteristics should play a role of major significance in the determination of sentence..... Rather, the absence of Guideline commands for defendant characteristics represents the Commission's wise judgment that it is far more difficult to quantify the effect that such characteristics should have on individual sentences, than it is to prescribe relative values to a variety of offenses. The Commission thus decided (i) that only in circumstances that are other than "ordinary" should such values affect the sentence, but (ii) that in such cases, the degree of impact on the sentence should be governed by reasonable discretionary departure, rather than by prescribed imperative Guideline calculations.

*Id.* at 1309. Judge Leval then affirmed a departure by the district court based on the defendant's "profound corruption and dishonesty, and his elaborate fraudulent manipulation." *Id.* at 1310. As discussed above and as decided in *Merritt,* structural aspects of the Guidelines and several Second Circuit cases support consideration of characteristics of the defendant as a basis for a departure under Section 5K2.0.

██ Here, in the commission of his offense, the defendant showed a complete, and nearly sociopathic disregard for the impact that his actions would have on others. There was no boundary that the defendant hesitated to cross to carry out the fraud. This is particularly apparent with respect to those to whom he was related or with whom he worked closely. In inventing the fraud, the defendant put at risk the reputation of his own father and his father's law firm, which was also his employer. He also put at risk the reputation and livelihood of those he brought into the scheme, including his close friend John Reznikoff, as well as Thomas Cloud, Seymour Hersh, and Mark Obenhaus. In au-

thoring and promoting the documents, he showed disdain for society's understanding of important political and historical figures including Joseph Kennedy, Robert Kennedy, John F. Kennedy, J. Edgar Hoover, Marilyn Monroe, and Cardinal Spellman. Building on the work of conspiracy theorists and on rumors, he intentionally and cynically fabricated documents designed to undermine the American public's confidence in its religious and governmental institutions. Finally, Cusack showed disrespect for the military and its heroes by wearing a military uniform to induce others to rely on him and even wearing that uniform adorned by a Navy Cross at Annapolis.

Each of these facts demonstrates to the Court that the defendant is a man without scruples, who would sacrifice any person or institution in the service of his greed. This characteristic is present to a truly appalling degree in the defendant's offense-related conduct. Furthermore, this reprehensible aspect of the defendant's character is not taken into account by the Sentencing Guidelines and is sufficiently unusual to take it out of the heartland of fraud cases. A departure under Section 5K2.0 is therefore appropriate on the basis of the defendant's character.

Although the Court regards this analysis of the defendant's character as sufficient to justify the departure, these same character traits indicate that the defendant is a criminal opportunist with a propensity to commit other crimes. The defendant's total disregard for injuries risked or imposed on others indicates a strong likelihood of recidivism. To the extent one is able to predict future behavior based on the offense of conviction and the light that sheds on the defendant's character, it is the Court's judgment that the defendant will likely seize any opportunity presented in the future to engage in fraudulent activity to enrich himself, and in doing so, will not restrain himself from injuring others— even those to whom he owes a special duty of loyalty—if he thinks it will benefit him.

**518**

The Court regards this as a valid concern for sentencing not already adequately taken into account by the Guidelines and one that independently supports a departure under Section 5K2.0. The Court believes that consideration of either of these factors supports a one level upward departure.

## CONCLUSION

The Court adopts the adjusted offense level of 26 recommended by the PSR. In addition, the Court has concluded both that a two level adjustment for obstruction of justice and a two level adjustment for abuse of trust are appropriate. This produces an adjusted offense level of 30, resulting in a Guidelines range of 97 to 121 months. The Court has also concluded that the factual record supports both a one category Section 4A1.3 departure and a one level departure under Section 5K2.0. Nonetheless, the Court does not believe it would be appropriate to impose those departures in addition to the adjusted offense level of 30.[13] In the event that the Court had not decided to apply the abuse of trust adjustment, however, the Court would have made both departures, resulting in the same sentencing range of 97 to 121 months.

SO ORDERED:

---

13. The reputational harm to the Catholic church was considered both under the Section 3B1.3 abuse of trust adjustment and under the Section 5K2.0 character departure. By declining to impose both the abuse of trust adjustment and the horizontal and vertical departures, any possible impermissible double counting is avoided. Nonetheless, the Court believes that it could have properly made both the abuse of trust adjustment and the two departures. First, the Court would have reached the same result under Section 5K2.0 based on the other circumstances described even if it had not considered the reputational harm to the Catholic church. Second, there is no impermissible double counting because the injury to reputation was considered under two different dimensions of the Guidelines for very different purposes: (1) as offense-related conduct for an abuse of trust adjustment and specifically as fulfilling the victim requirement, and (2) as offense-related conduct indicative, along with other similar instances, of the defendant's character. *See United States v. Carrozzella,* 105 F.3d 796, 801 n. 1 (2d Cir.1997) (internal quotation omitted).